**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

**IN ADMIRALTY**

| | | |
|---|---|---|
| Charleston Marine Manufacturing Corporation, | ) | C/A No. <u>2:26-cv-02446</u>-DCN |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| Versus | ) | |
| | ) | |
| MSC Mediterranean Shipping Company S.A.; | ) | *NON-JURY* |
| MSC Shipmanagement LTD.; Kyveli | ) | |
| Oceanway LTD.; and M/V MSC Michigan VII, | ) | |
| her engines, boilers, tackle, apparel, furniture, | ) | |
| and all other necessaries thereunto appertaining | ) | |
| and belonging, in rem, | ) | |
| | ) | |
| Defendants. | ) | |

**INTRODUCTORY STATEMENT**

On June 5, 2024, the M/V MSC Michigan VII — a 1,000-foot container ship operated by one of the world's largest shipping companies — left the State Ports Authority's North Charleston Terminal outbound for the Atlantic Ocean with a throttle stuck in the full-speed-ahead position. No one on board could stop it. As the Vessel accelerated to 14 knots down the Cooper River — twice the normal transit speed — the throttle linkage rod had already disconnected from repeated improper manual adjustments made by untrained crew members who had been secretly manipulating the engine controls for some time before departure. The Vessel's chief engineer, Fernando San Diego San Juan, knew the system was compromised and said nothing. He later pled guilty in this Court to failing to report a hazardous condition to the United States Coast Guard and to lying to federal investigators.

What followed was one of the most alarming maritime incidents in the history of the Port of Charleston. Law enforcement cleared the Arthur Ravenel Jr. Bridge with one minute to spare as the runaway container ship bore down on the span. It was not MSC's seamanship that averted

catastrophe — it was the extraordinary skill and composure of the Charleston Branch Harbor Pilot, who guided the run-away vessel safely through the harbor, past the bridge, and ultimately to anchorage offshore in the Atlantic Ocean. The harbor pilot's professionalism in the face of a crisis not of his making is the reason this case involves a property damage claim rather than a maritime disaster of historic proportions.

But the property damage is real, severe, and fully documented. As the M/V MSC Michigan VII raced down the Cooper River at twice normal speed, its massive wake radiated outward with destructive force, striking the facilities of Charleston Marine Manufacturing Corporation ("CMMC") at the former Charleston Naval Station/Navy Yard. The wake damage destroyed and severely damaged multiple piers and fendering systems — critical infrastructure supporting the United States Maritime Administration Ready Reserve Force fleet. Despite nearly two years of patience, completed repairs, and full documentation, MSC has refused to pay. This action follows.

## THE PARTIES

1.    Plaintiff Charleston Marine Manufacturing Corporation ("CMMC") is a corporation organized and existing under the laws of South Carolina, with its principal place of business at the former Charleston Naval Station/Navy Yard, North Charleston, South Carolina. CMMC owns a number of the deep-water pier facilities along the Cooper River, including multiple piers used to berth and support vessels of the United States Maritime Administration ("MARAD") Ready Reserve Force fleet and other maritime operations.

2.    Defendant MSC Mediterranean Shipping Company S.A. ("MSC") is a foreign corporation organized and existing under the laws of Switzerland, with its principal office in Geneva, Switzerland. MSC is one of the world's largest container shipping companies and, at all times relevant hereto, was the time charterer of the M/V MSC Michigan VII.

3.      Defendant MSC Shipmanagement Ltd. ("MSC Shipmanagement") is, upon information and belief, a company organized and existing under the laws of Cyprus, and was, at all times relevant hereto, the ISM Manager and operator of the M/V MSC Michigan VII responsible for its crewing, maintenance, and mechanical condition.

4.      Defendant Kyveli Oceanway Ltd. ("Kyveli") is, upon information and belief, a company organized and existing under the laws of Cyprus, and was, at all times relevant hereto, the registered owner of the M/V MSC Michigan VII.

5.      Defendant M/V MSC Michigan VII (the "Vessel") is a container vessel bearing IMO No. 9319854, flagged in Liberia, with a registered port of Monrovia. At the time of the incident described herein, the Vessel was owned by Kyveli Oceanway Ltd. and operated and/or managed by MSC and/or MSC Shipmanagement Ltd. The Vessel is named as a defendant *in rem* and is subject to arrest pursuant to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## JURISDICTION AND VENUE

6.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty or Maritime Claims. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333(1). The claims arise from a maritime tort — property damage caused by the excessive and uncontrolled wake of a vessel operating in navigable waters — a category of claim squarely within admiralty jurisdiction.

7.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District, the damaged property is located in this District, and the related criminal proceedings were adjudicated in this District.

8. Plaintiff designates this action as one in admiralty and maritime jurisdiction pursuant to Fed. R. Civ. P. 9(h). Accordingly, this action shall proceed as an admiralty case without jury trial.

## FACTUAL ALLEGATIONS

9. At all times material hereto, Defendants owed a duty to maintain the M/V MSC Michigan VII in a seaworthy condition — with her hull, machinery, equipment, and crew reasonably fit for their intended purposes — and to operate the Vessel with reasonable care in the navigable waters of the Port of Charleston.

10. In the period leading up to June 5, 2024, crew members aboard the M/V MSC Michigan VII had been repeatedly adjusting the Vessel's engine throttle linkage rod manually. These crew members were not trained or qualified to perform such adjustments. The repeated improper manual manipulation of the linkage rod caused it to become disconnected from the engine throttle control system.

11. The disconnection of the throttle linkage rod rendered the Vessel's crew unable to reduce engine speed through normal bridge or engine control room commands. This defect was known, or should have been known, to Defendants prior to the Vessel's departure from the State Ports Authority's North Charleston Terminal on June 5, 2024.

12. Fernando San Diego San Juan ("San Juan"), the Vessel's chief engineer, was aware of the compromised condition of the throttle control system prior to and during the Vessel's departure on June 5, 2024. San Juan failed to report this hazardous condition to the United States Coast Guard and subsequently lied to federal investigators about the circumstances. He later pled guilty in this Court to both offenses.

13. The failures of Defendants and the Vessel's crew, including but not limited to the use of untrained personnel to adjust critical engine control components, the failure to maintain the throttle linkage in proper working order, the failure to detect and correct the defect prior to departure, and the failure to report the hazardous condition to the Coast Guard, rendered the Vessel unseaworthy and constituted negligence under general maritime law.

14. On June 5, 2024, at approximately 12:15 p.m., the M/V MSC Michigan VII departed the State Ports Authority's North Charleston Terminal outbound for the Atlantic Ocean. Due to the disconnected throttle linkage rod, the Vessel's throttle became stuck in the full-speed-ahead position. The Vessel could not be slowed or stopped through normal engine controls.

15. As a result, the M/V MSC Michigan VII accelerated to approximately 14 knots — twice the normal transit speed for a vessel of her size operating in the Cooper River — as she proceeded outbound through the Port of Charleston.

16. The Vessel's uncontrolled speed at 14 knots through a confined, heavily used waterway generated an extraordinarily large and powerful wake — far in excess of what would be expected or permitted of a vessel operating with due care in the Port of Charleston.

17. Law enforcement authorities cleared traffic from the Arthur Ravenel Jr. Bridge with approximately one minute to spare as the runaway vessel bore down on the span.

18. The potential for catastrophic loss of life and structural damage to the bridge was immediate and grave.

19. It was the extraordinary skill, composure, and professional seamanship of the Charleston Branch Harbor Pilot — not any action by Defendants or the Vessel's crew — that averted a maritime disaster of historic proportions. The harbor pilot guided the run-away M/V MSC Michigan VII safely through the harbor, past the Ravenel Bridge, and ultimately to

anchorage offshore in the Atlantic Ocean. The harbor pilot's actions are the reason this Court is considering a property damage claim rather than a catastrophic loss of life.

20. The Vessel remained under an international detention order for 45 days following the incident and was permitted to depart only after investigators determined it was safe to operate.

21. As the M/V MSC Michigan VII raced outbound at 14 knots — twice normal speed for a 1,000-foot vessel in the confined waters of the Cooper River — the Vessel generated a massive, destructive wake that radiated outward from its hull with far greater force than any vessel operating lawfully and safely in those waters would produce.

22. The excessive wake generated by the M/V MSC Michigan VII struck CMMC's pier facilities at the former Charleston Naval Station/Navy Yard with destructive force, causing severe damage to CMMC's piers and fendering systems.

23. Specifically, the wake damage caused by the M/V MSC Michigan VII resulted in the following damage to CMMC's property:

(a) Destruction of the mooring dolphin at Pier Tango;

(b) Damage to the pipe fendering systems at Piers Sierra, Tango, and Uniform, requiring replacement of twelve of the twelve individual pipe fenderings across the three piers with a six new Trelleborg units; and

(c) Structural damage to Piers Foxtrot and Hotel.

24. The damage to CMMC's facilities was a direct and proximate result of the excessive wake generated by the M/V MSC Michigan VII operating at uncontrolled and unlawful speed through the Cooper River, which was in turn a direct and proximate result of Defendants' negligence, the Vessel's unseaworthy condition, and the failures of the Vessel's crew described herein.

25.    On September 18, 2025, San Juan, the Vessel's chief engineer, entered a guilty plea in this Court to two counts: (1) failing to report a hazardous condition to the United States Coast Guard; and (2) making false statements to federal investigators. The Statement of Facts accompanying that plea is part of the public record of this Court and establishes the mechanical history of the throttle linkage failure and the crew's knowledge thereof prior to departure.

26.    In early 2026, the parties reached a partial settlement agreement (the "Dolphin Settlement") addressing solely the loss of the Pier Tango mooring dolphin. Paragraph 4 of the Release executed in connection with the Dolphin Settlement expressly reserved all of CMMC's claims for damage to property other than the mooring dolphin. The claims asserted in this Complaint were expressly preserved by the terms of the Dolphin Settlement and are entirely outside its scope.

27.    CMMC has completed both phases of its post-incident repairs. Defendants' own surveyor, Eli Scott of SE Marine, was present and had the opportunity to inspect the repairs throughout the process.

28.    The Piers Sierra, Tango, and Uniform fendering replacement was completed on December 11, 2025, following 45 days of active construction by Cape Romain Construction. The pipe fendering system damaged by the Vessel's wake was removed and replaced with a new Yokohama fendering system on all three piers. The total documented cost of this work, supported by itemized invoices, photographs, and backup documentation, is in excess of $1,000,000.00.

29.    This fendering replacement was performed with six MARAD Ready Reserve Force vessels — the Cape Edmont and Cape Douglas (Pier Sierra), Cape Ducato and Cape Decision (Pier Tango), and Cape Diamond and Cape Domingo (Pier Uniform) — remaining at berth throughout the repair period. CMMC coordinated this work at considerable logistical complexity to avoid

requiring the MARAD vessels to move, thereby substantially mitigating Defendants' exposure. Had CMMC been required to shift these six vessels, the associated costs would have totaled between $2,500,000 and $3,000,000.

30.    The structural damage to Piers Foxtrot and Hotel is documented in a Marine Survey Report prepared by James Lucas, Marine Surveyor, with Defendants' own surveyor, Eli Scott, in attendance. The total documented damages to Piers Foxtrot and Hotel are may exceed $1,000,000.00.

31.    CMMC's total property damage is but one aspect of the financial burden it has sustained as a result of this incident.

## COUNT I – NEGLIGENCE
### (Against MSC, MSC Shipmanagement Ltd., and Kyveli Oceanway Ltd.)

32.    Plaintiff realleges and incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

33.    At all times material hereto, Defendants MSC, MSC Shipmanagement Ltd., and Kyveli Oceanway Ltd. owed duties of reasonable care to CMMC, including the duty to maintain the M/V MSC Michigan VII in a seaworthy and mechanically sound condition, to ensure that the Vessel's crew was properly trained for any adjustments made to critical engine control components, to detect and report known mechanical hazards, and to operate the Vessel at a safe and lawful speed in the confined waters of the Cooper River.

34.    Defendants breached these duties in the following respects, among others:

(a)    Permitting untrained crew members to repeatedly adjust the Vessel's throttle linkage rod manually, causing it to disconnect from the engine throttle control system;

(b)    Failing to maintain the throttle linkage in proper working order and failing to detect or remedy the disconnection prior to departure;

8

(c)     Failing to report the known hazardous condition of the Vessel's throttle control system to the United States Coast Guard prior to departure, as required by law;

(d)     Permitting the Vessel to depart the State Ports Authority's North Charleston Terminal with a known, uncorrected mechanical defect that rendered the throttle control inoperable;

(e)     Operating the Vessel at twice the normal transit speed through the confined, heavily trafficked waters of the Cooper River, generating a massive and destructive wake; and

(f)     Otherwise failing to exercise reasonable care in the ownership, operation, management, and crewing of the Vessel.

35.     As a direct and proximate result of Defendants' negligence, the M/V MSC Michigan VII generated an excessive and destructive wake that caused severe damage to CMMC's pier facilities at the former Charleston Naval Station/Navy Yard on June 5, 2024, resulting in total property damage in the millions of dollars, plus pre-judgment interest from June 5, 2024, costs, and all other relief to which CMMC may be entitled.

### COUNT II – UNSEAWORTHINESS
### (Against MSC, MSC Shipmanagement Ltd., and Kyveli Oceanway Ltd.)

36.     Plaintiff realleges and incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

37.     Under general maritime law, Defendants, as owner, operator, and/or manager of the M/V MSC Michigan VII, owed an absolute, non-delegable duty to provide a seaworthy vessel — one whose hull, machinery, equipment, and crew were reasonably fit for their intended purposes.

38.     The M/V MSC Michigan VII was unseaworthy at the time of her departure on June 5, 2024, by reason of, among other things: (a) the disconnected throttle linkage rod that rendered the engine throttle control system inoperable; and (b) the presence of crew members who were untrained and unqualified to perform adjustments to critical engine control components, whose

improper manual manipulations of the linkage rod caused the disconnection that resulted in loss of speed control.

39.     The unseaworthy condition of the Vessel was a proximate cause of the Vessel's uncontrolled speed, the excessive wake she generated, and the resulting damage to CMMC's facilities.

40.     As a direct and proximate result of the unseaworthiness of the M/V MSC Michigan VII, CMMC suffered property damage in an amount greater than $1,700,000.00, plus pre-judgment interest from June 5, 2024, costs, and all other relief to which CMMC may be entitled.

### COUNT III – NEGLIGENCE PER SE / PENNSYLVANIA RULE
### (*In Rem* Against M/V MSC Michigan VII)

41.     Plaintiff realleges and incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

42.     Under the Pennsylvania Rule, a vessel that violates a statutory rule intended to prevent maritime casualties is presumed to be at fault, and bears the burden of proving that the violation could not have contributed to the casualty.

43.     The M/V MSC Michigan VII departed the Port of Charleston in violation of applicable federal statutes and regulations, including without limitation: (a) 46 U.S.C. § 2306, which requires the master or other responsible officer to report a hazardous condition to the Coast Guard; (b) applicable Coast Guard regulations governing the seaworthy operation of vessels in United States navigable waters; and (c) the Navigation Rules requiring vessels to proceed at a safe speed. 33 U.S.C. § 1602 et seq.; 33 C.F.R. § 83.06.

44.     These violations — operating with an inoperable throttle control, failing to report the hazardous condition, and proceeding at 14 knots through a confined harbor — were the proximate cause of the Vessel's uncontrolled speed, the excessive wake, and the resulting property

damage to CMMC's facilities. Under the Pennsylvania Rule, the Vessel is presumed at fault and bears the burden of proving that these violations could not have caused the damage — a burden it cannot carry given the criminal record of this Court.

45.     The M/V MSC Michigan VII is liable to CMMC in rem for all property damages arising from the June 5, 2024, plus pre-judgment interest from June 5, 2024, costs, and all other relief to which CMMC may be entitled.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CMMC respectfully requests that this Court:

1.     Enter judgment in favor of CMMC and against Defendants MSC Mediterranean Shipping Company S.A., MSC Shipmanagement Ltd., and Kyveli Oceanway Ltd., in personam, jointly and severally, as determined by the Court, plus pre-judgment interest from June 5, 2024, costs, and all other relief to which CMMC may be entitled;

2.     Enter judgment in favor of CMMC and against the M/V MSC Michigan VII, in rem, in an amount to be determined by the Court, plus pre-judgment interest from June 5, 2024, costs, and all other relief to which CMMC may be entitled;

3.     Issue a warrant for the arrest of the M/V MSC Michigan VII, her engines, boilers, tackle, apparel, furniture, and all other necessaries thereunto appertaining and belonging, in rem, pursuant to the Supplemental Rules for Admiralty or Maritime Claims, and that all persons claiming any interest therein be cited to appear and answer this Complaint;

4.     In the event that substitute security is posted in lieu of vessel arrest, that such security be deemed sufficient and that judgment be entered against the substitute security;

5.     Award CMMC pre-judgment interest at the applicable rate from June 5, 2024 through the date of judgment;

6.     Award punitive damages against the Defendants for the willful, wanton and reckless conduct that resulted in the damage described above;

7.     Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

11

Date: **June 19, 2026**

**/s/ James B. Hood**
James B. Hood (FED #9130)
james.hood@hoodlaw.com
HOOD LAW FIRM, LLC
172 Meeting Street / Post Office Box 1508
Charleston, SC  29402
Ph: (843) 577-4435 / Fax: (843) 722-1630
Email: Info@hoodlaw.com

W. Andrew Gowder, Jr. (FED # 2411)
andy@austengowder.com
Austen & Gowder, LLC
1629 Meeting Street, Suite A (29405)
P.O. Box 20820
Charleston, SC 29413
Officer: 843.727.2229 / Mobile: 843.870.0307

*Attorneys for the Plaintiff*
*Charleston Marine Manufacturing Corporation*